*In re* MARRIAGE OF PAUL L. STONE, Petitioner-Appellee, and ANNET HLAVNA STONE, n/k/a Annet Hlavna Stein, Respondent-Appellant (H. Carl Runge, Jr., Appellant).

Fourth District   No. 4—89—0633

Opinion filed May 9, 1990.

G. Michael Taylor, of Stratton, Dobbs, Nardulli & Lestikow, of Springfield, for appellant Annet H. Stone.

R. Dan Winnett, of Law Offices of H. Carl Runge, Jr., Ltd., of Collinsville, for appellant H. Carl Runge, Jr.

Glenn O. Fuller, of Fuller, Hopp, Barr, McCarthy & Quigg, of Decatur, for appellee.

JUSTICE GREEN delivered the opinion of the court:

The marriage of petitioner Paul L. Stone and respondent Annet Hlavna Stone, n/k/a Annet Hlavna Stein, was dissolved by the circuit court of Jersey County on May 25, 1984. That judgment approved an agreement of the parties making petitioner and respondent the joint custodians of their minor children, Jason, Matthew, and Benjamin. Subsequently, petitioner was permitted to enroll that judgment in the circuit court of Moultrie County. On May 30, 1986, petitioner obtained a default order in the Moultrie County court reducing respondent's visitation privileges with the children and reducing her summer custody of Jason.

Subsequently, various other proceedings took place in the circuit court of Moultrie County. Those with which we are most concerned arose from petitioner's petition filed March 30, 1988, to further modify the custody judgment. Respondent counterclaimed, also seeking modification. In addition, she filed a petition to strike the pending petition and to hold petitioner in contempt for failure to pay support payments. On August 18, 1988, petitioner moved the court to impose sanctions against respondent and H. Carl Runge, Jr., her attorney, pursuant to the provisions of section 2—611 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). After hearings, the circuit court entered an order on January 5, 1989, placing the custody of all the children with petitioner, with right of reasonable visitation in respondent. On July 31, 1989, the court granted petitioner's request for sanctions and found respondent and Runge jointly and severally liable to petitioner in the sum of $30,000, which figure represented both attorney fees incurred by petitioner in defending improper pleadings filed on behalf of respondent and as punishment against Runge and her for filing those pleadings.

Respondent has appealed both judgments, and Runge has appealed from the judgment of July 31, 1989. At oral arguments, respondent agreed that the order modifying custody may stand. In regard to the order for sanctions, respondent and Runge or one of them contends (1) the court lacked jurisdiction to enter that order, (2) section 2—611 of the Code is unconstitutional, (3) the evidence was insufficient to justify the imposition of sanctions, (4) the court erred in refusing to consider new evidence at the sanctions hearing, (5) the affidavits filed by petitioner concerning the fees and costs he incurred were inadequate, and (6) in imposing sanctions, the court essentially

was assessing a penalty for allegedly libelous activity. For reasons hereinafter stated, we disagree and affirm.

Section 2—611 of the Code, upon which the sanctions were based, requires every pleading to be signed by at least one attorney for the filing party. The signature is taken as a certificate the attorney (1) has read the document, (2) "that to the best of his knowledge, information, and *belief formed after reasonable inquiry it is well grounded in fact*," and warranted by present law or a good-faith argument as to what the law should be, and (3) the document is "not interposed for any improper purpose, such as to harass or to cause unnecessary delay" or costs of litigation. (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.) Section 2—611 authorizes the court to impose upon any attorney or party signing a statement violative of the foregoing a sanction which can include payment of the opponent's expenses, including attorney fees arising from the violation.

Petitioner sought sanctions for the filing of both the counterclaim and the request to hold petitioner in contempt. He contended those documents contained factual allegations which were not well grounded in fact, and respondent knew they were false and inappropriate. He further maintained Runge had failed to conduct a reasonable inquiry into the case to determine whether the documents were well grounded and not filed for an improper purpose.

Section 2—611 of the Code also states:

"All proceedings under this Section shall be *within, and part of the civil action in which the pleading*, motion or other paper referred to herein *has been filed*, and *no violation* or alleged violation of this Section *shall give rise to a separate cause of action*, or another cause of action within the civil action in question, by, on behalf of or against any party to the civil action in question, and by, on behalf of or against any attorney or insurance company involved in the civil action in question." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.)

Respondent and Runge contend petitioner's motion for sanctions was untimely because it was filed on August 18, 1988, while the written order on the underlying pleadings was not entered until January 5, 1989, although the court had pronounced its ruling in open court on May 26, 1988. Based upon the opinion of the Second District Appellate Court in *Herman v. Fitzgerald* (1989), 178 Ill. App. 3d 865, 533 N.E.2d 1144, respondent and Runge contend a section 2—611 petition must conform to the requirements for a post-trial motion.

In *Herman*, a party had filed a section 2—611 petition 44 days after the entry of final judgment in the underlying case. The

court held the petition was untimely, as the circuit court had lost jurisdiction after the lapse of 30 days from entry of the final judgment. The court noted section 2—1203 of the Code (Ill. Rev. Stat. 1987, ch. 110, par. 2—1203) required post-trial motions to be filed within the 30-day period, and some cases had referred to a section 2—611 motion as a post-trial motion. However, the *Herman* opinion also stated:

> "[S]ection [2—611] quite plainly requires that any petition filed under its auspices must be within and part of the ongoing civil action. It specifically prohibits a party from initiating a separate cause of action. *It is clear that, during the course of a lawsuit, either party may file a section 2—611 petition at any time.* \*\*\*
>
> \*\*\*
>
> \*\*\* Further, the defendant could have brought her section 2—611 petition *at any time after the offending pleading was filed* \*\*\*. *There is no requirement in the section that a party must wait until after judgment to file such a petition.*" (Emphasis added.) (*Herman*, 178 Ill. App. 3d at 869-70, 533 N.E.2d at 1146-47.)

Clearly, *Herman* is no authority for the proposition that section 2—611 petitions must be filed after the final order in the underlying case. Rather, the *dictum* of *Herman* supports the clear indication of section 2—611 that a petition for sanctions can be filed any time after the offending pleading is filed as long as it is not filed after the circuit court has lost jurisdiction of the underlying case. The instant petition for sanctions was timely.

■ Runge challenges the constitutionality of section 2—611 of the Code as it applies to lawyers. He notes the Illinois Supreme Court has historically been given the authority to prescribe rules governing attorney conduct and to sanction attorney misconduct. Because of this prior history and because section 2—611 has been recognized as penal in nature and the equivalent of attorney discipline, he contends section 2—611 is an unconstitutional encroachment by the legislature upon the Illinois Supreme Court's inherent authority to discipline attorneys. The issue raised by Runge appears to be one of first impression. Prior to November 25, 1986, section 2—611 of the Code applied only against parties and not their attorneys. (*Ignarski v. Heublein* (1988), 171 Ill. App. 3d 830, 525 N.E.2d 995.) Only upon amendment of that section effective November 25, 1986, could sanctions then be imposed against attorneys, too.

■ Petitioner attempts to characterize section 2—611 as a proce-

dural provision. The supreme court has recognized that the legislature has power to enact laws governing judicial practice in the circuit court when the supreme court has not acted and where the legislation does not conflict with the supreme court's inherent power. (*O'Connell v. St. Francis Hospital* (1986), 112 Ill. 2d 273, 492 N.E.2d 1322.) However, section 2—611 is clearly penal in nature when, as here, a party and/or attorney is ordered to pay an amount in excess of the actual fees and expenses incurred. Other courts have concluded the section is penal in nature. *Fried v. Barad* (1989), 187 Ill. App. 3d 1024, 543 N.E.2d 1018; *People ex rel. West v. Herrendorf* (1989), 187 Ill. App. 3d 777, 543 N.E.2d 824.

Runge cites *In re Mitan* (1987), 119 Ill. 2d 229, 518 N.E.2d 1000, for the proposition that the supreme court possesses the inherent and exclusive power to govern admission to, and to regulate, the practice of law in Illinois as well as the power to sanction or discipline the unprofessional conduct of attorneys admitted to practice before it. In *Mitan,* the court addressed the issue of whether section 2—611 applied to the filing of an allegedly false petition for reinstatement as an attorney licensed to practice law. Ironically, while the court concluded section 2—611 did not apply to reinstatement proceedings because they are *sui generis*, the court did recognize its availability in all civil actions. This indicates an absence of tension between the two areas and is sufficient to uphold the constitutionality of section 2—611.

Both respondent and Runge contend the record does not justify the sanctions imposed upon them. We have previously summarized the extensive proceedings prior to respondent's filing of her counterclaim and her petition to strike petitioner's pending custody petition and hold him in contempt. Those earlier proceedings were hotly contested, but we need not discuss them in detail. We reluctantly conclude we must discuss the subsequent pleadings and surrounding facts regardless of how distasteful it is to do so.

In her counterclaim, respondent maintained the presence of certain "facts" warranted a change of custody. In particular, she noted several "facts" which had allegedly occurred *prior* to entry of the initial judgment implementing the joint-custody arrangement and which she had not previously disclosed out of fear of the petitioner. Those allegations included the following:

> "A. That [petitioner] had forced Respondent to enter into a course of conduct of strange, unusual and dangerous sexual practices, including third party involvement; the Petitioner would require Respondent to become involved in sexual activities with third parties while he acted as a voyeur, and he then

followed performing sexual activities with the Petitioner; that during part of the activities while conducting said sexual activities with third parties, the Petitioner would masturbate and watch the activities, and would threaten the Respondent with harm in the event she was to divulge said information.

B. That during the course of the marriage, the Petitioner required that the Respondent use certain artificial dildos in the rectal area of the Petitioner and then would require that the Respondent take pictures of the Petitioner [in] said sexual activity.

C. That the aforementioned aberrations caused great physical fear to the Respondent and are so unusual and bizarre that minor children who are now reaching the age of puberty should not be allowed to be in the presence of, or be raised by, a person who would preach and teach sexual activity of such a nature.

D. That both prior to the entry of the Judgment of custody this course of conduct was unknown to the Court and even to the present time the Petitioner is involved in what are commonly known as "swingers"; and that he keeps certain magazines around the house called swinger magazines which the children have told the Respondent they have seen, examined, and been exposed to."

Respondent cited additional changes in circumstances which she claimed mandated a transfer of custody, including petitioner's (1) unwillingness to cooperate with respondent with regard to visitation, (2) failure to obtain proper health care for the benefit of the children and his opposition to medical insurance, and (3) failure to maintain normal hygiene for the children.

The answer and counterclaim was submitted by Runge. An affidavit attached to the document, however, indicated respondent had read that document, was familiar with its contents, and the matters stated therein were true to the best of her knowledge. The allegations concerning petitioner's alleged sexual practices were eventually stricken and not repleaded.

At the hearing on the cross-petitions for a modification in custody, respondent testified extensively concerning petitioner's alleged strange and unusual sexual practices. She testified he was involved in "swinger" activities and kept swinger magazines in the home. She said he initially requested that they view pornographic swinger magazines during sexual intercourse, but later told her he was going to call the people in the "swinger" photos and have them come and engage

in sex with them.

Respondent said petitioner requested they attend XX- and XXX-rated movies when they were out of town at conventions, and, once, when attending a movie, he met a man, left with him, and later told her he had had sex with him. She recalled another incident when petitioner showed her sister and husband photographs of petitioner and respondent in the nude or engaged in sexual activities and asked them if they wanted him to photograph them, too.

Respondent said that, when she returned to live with petitioner in 1983, he told her they would have to change their relationship, and she would have to start bringing people home with her and have sex with them while he watched. She said she tried to become involved with the sort of sex that petitioner wanted. She started showing photographs of herself or petitioner to people she met and asking them if they wanted to come home with her. She said she talked to many, including a man named J.A., but no one ever came home with her.

Little, if any, of respondent's testimony was corroborated by other testimony. In fact, J.A. testified respondent had never shown him any nude pictures or asked him to go home with her and have sex with her in front of her husband. One of the parties' sons did indicate he had seen magazines containing some "pretty heavy duty stuff" in their home right after his mother moved out, and petitioner stated he had not had any of them in his home since May 1986. Petitioner denied all other accusations.

Respondent herself admitted there never was an occasion where she had had sex with another person in front of her husband with her husband either acting as voyeur or masturbating. She said, though, that, because she was unsuccessful, petitioner required her to tell him in detail what might happen if she did in fact bring another person home. She further admitted she had never heard petitioner preach, teach or advocate any particular sexual practice to any person other than herself, and she had never heard him say anything of that nature to their children.

Petitioner testified respondent had in the past threatened to expose flyers containing nude pictures of him if he did not comply with her requests. Respondent admitted preparing the flyers and showing them to petitioner in 1984 because she said she was angry at him for forcing her to enter into their 1984 custody arrangement. However, she denied making any threats to distribute them. She said she had no intention of trying to disrupt or affect his then current campaign for the office of State's Attorney.

Evidence was presented that a flyer containing a nude photograph

of petitioner was distributed around February 7, 1988, at a time when petitioner was campaigning for circuit judge. Petitioner opined respondent had participated in the distribution of those flyers. Respondent denied any knowledge of or involvement in the circulation of the posters.

Mary Shenke Sanderson, an employee of the Champaign-Urbana News-Gazette, testified that, in January 1988, she conversed with respondent and then wrote an article for the News-Gazette concerning the allegations in the counterclaim. She said respondent had told her her motives for contacting the paper were that she was concerned about her son's health and she did not think petitioner should be a judge.

Respondent admitted she voluntarily went to the News-Gazette as well as the Decatur Herald and Review and brought her pleadings and other allegations to their attention. She said she did not "ask" them to print an article but realized there was a possibility an article might be published which could contain details of the parties' private sex lives. However, she stated petitioner had told her she would not stand a chance if he "got into Moultrie County," and she was afraid she would lose everything, so she went to the newspapers. She was also concerned for Jason's health.

The circuit court's written order of January 5, 1990, placing custody of all of the three children with petitioner made certain findings which bear on the sanctions issue. The findings indicated the following: (1) respondent made false factual allegations about petitioner's sexual conduct, (2) she appeared at newspaper offices and encouraged them to publish an article, (3) flyers containing nude pictures of petitioner were distributed, and this was done with the knowledge, encouragement or acquiescence of respondent, (4) respondent did not offer any credible evidence to support numerous allegations contained in her counterclaim, (5) respondent apparently had a deep hostility towards petitioner and was motivated to attack and harass him, and (6) respondent's actions were not undertaken with the best interests of the children in mind but instead with a complete disregard of the deleterious effect they could have upon them.

At the subsequent hearing on the motion for sanctions, Runge testified he had had several conversations with respondent and her previous attorney, Arthur Lerner, with regard to the petition to strike and hold petitioner in contempt. He conceded he had not attempted to determine the names of other attorneys involved or examine the applicable trial and appellate files. He stated at some point he learned the monetary amount discussed in the petition for contempt had been

paid by petitioner and admitted the amended petition he filed with the court was not accurate.

With regard to the counterclaim he filed on behalf of respondent, Runge said that, in drafting the document, he relied upon the information given to him by respondent, her husband Nathan Stein, and several doctors and psychologists. He acknowledged he did not interview the parties' three minor children or J.A., the man whom respondent allegedly solicited to come home with her at petitioner's request. He stated it generally was not his practice to interview children in a contested custody situation. Furthermore, he stated he did not determine where the case had previously been litigated and did not examine the applicable court files. He said he knew some of respondent's prior attorneys but did not think he had tried to contact them regarding the case. He acknowledged he knew petitioner practiced law and held the position of State's Attorney.

Runge said he did discuss the case with Mr. Lerner, however. He said respondent had come to him to see if he would defend a petition for change of custody and/or file a counterclaim. He said he obtained a copy of a proposed answer and counterclaim from either respondent or Lerner and telephoned Lerner about them. He stated he "was concerned about the seriousness of the allegations, particularly [those] in the counterclaim, [and] what had been the ongoing situation vis-a-vis the children and the parents." He said he went through each allegation with Lerner, redrafted the document and then went through the allegations with respondent. He stated she revealed to him, either specifically or generally, the evidence she had with regard to each allegation. He said he advised his client to not go to the newspapers with her allegations.

Respondent testified at the hearing that Lerner had prepared an initial petition for change of custody for her. She stated she had told him her husband required her to speak with men and ask them to return home and have sex, but she never told him such contacts *actually* occurred. She said she read the document he prepared but did not object to its wording. She said she trusted his judgment and thought whatever he put in the document based on her conversations with him was true and correct.

At the time of pronouncing its decision on the motion for sanctions, the circuit court noted: (1) the amended petition to strike petitioner's petition had set forth as facts matters which were patently false; (2) one allegation of the counterclaim concerning petitioner's sexual conduct "was so egregious and so devastating in its effect that any reasonable litigant or attorney should have *** investigate[d]

such claims at great length" before filing; (3) before filing the counterclaim, "Runge \*\*\* should have discussed the matter carefully with counsel [and] with all potential witnesses and [should have] left no stone unturned"; and (4) Runge had not done so.

■ The question with regard to Runge is whether he conducted a reasonable inquiry into the matters in question before filing both the petition to strike and the counterclaim. Section 2—611 of the Code was modeled after Rule 11 of the Federal Rules of Civil Procedure. (28 U.S.C. app. Rule 11, Rules of Civil Procedure (Supp. V 1988).) Advisory committee notes to the Federal rule state:

> "The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." 28 U.S.C. app. Rule 11, Rules of Civil Procedure at 129 (Supp. V 1988) (Notes of Advisory Committee on Rules—1983 Amendment).

In *Chicago Title & Trust Co. v. Anderson* (1988), 177 Ill. App. 3d 615, 532 N.E.2d 595, both a defendant to a mortgage foreclosure action and his attorney were sanctioned by being required to pay a portion of the mortgagee's attorney fees after making erroneous factual assertions in an answer to the complaint for foreclosure and defendant's response to the mortgagee's motion for summary judgment. The defendant had contended he had made payments which kept him current on the underlying obligation, but he could not produce evidence of the payments. Both defendant and his counsel admitted they knew defendant was in default at some time before they answered the motion for summary judgment denying an arrearage. The attorney admitted he had filed the answer denying the arrearage without asking his client for documentation of the payments the client alleged to have made.

■ In upholding the imposition of the sanction as not constituting a breach of discretion, the *Anderson* court stated:

> "[A]s a general rule, an attorney cannot simply rely on the

client's verbal representations when the client has in his possession additional information bearing on the facts, or when additional information is readily ascertainable from third parties. *** [T]he attorney must objectively review the information submitted by his client, to determine if it factually supports the client's claim; if such review reveals important discrepancies, inconsistencies, or gaps in the information provided, the attorney must investigate further before filing the relevant legal paper with the court." *Anderson,* 177 Ill. App. 3d at 624-25, 532 N.E.2d at 601.

Here, the evidence is clear that respondent was attempting to harass petitioner. This would be apparent even if her allegations of sexual misconduct were true. Because of this, her counsel should have been particularly careful in regard to the allegations made. Runge had discussed the case with respondent's most recent counsel, but he had not discussed the matter with other of her attorneys. Had he contacted Harold Belsheim, one of her prior attorneys, he would have found the alleged arrearage of child support, upon which respondent relied in her request to have respondent held in contempt, did not exist because the fact of its payment was revealed in a malpractice suit by respondent against that attorney.

Runge admitted he did learn at some point that some of the monies discussed in the petition had been paid by petitioner and that the amended petition he filed with the court had been inaccurate. Petitioner's attorney had informed him the payments had been made, and Runge acknowledged that he had. However, Runge still filed an amended petition alleging monies were due and owing even after he learned about this information.

In regard to the allegations of the counterclaim, Runge did make reasonable inquiries into some of the alleged factual matters in question. For instance, he did contact the children's doctors and psychologists and even deposed them. A genuine dispute appeared to exist as to whether petitioner was providing his children with proper medical attention and whether he had acted rationally in allowing his oldest son with epilepsy to drive. He did not attempt to interview any of the children, but his explanation that he does not deem it appropriate to interview children involved in a child custody action was not unreasonable.

Considering the seriousness of the sexual allegations and the existence of respondent's intention to harass petitioner, Runge's inquiry in that regard could properly have been found by the circuit court to be inadequate. Admittedly, the matters involved were difficult to ei-

ther prove or disprove, but the only other source he contacted was respondent's new husband, Nathan Stein. He did not attempt to interview J.A. Runge was under no time constraint because the children were not shown to be in great danger, and none of the improprieties attributed to petitioner were alleged to have taken place in front of the children.

■ Respondent's counterclaim alleged not only that petitioner sought bizarre sexual activities but also that the activities actually took place. In order to obtain sanctions against respondent for making these allegations, petitioner had the burden of proving the falsity of these allegations. In the hearing on the counterclaim, petitioner testified virtually all of these allegations were untrue. Respondent's testimony, at best, only tended to support her theory that petitioner sought those activities. Respondent was college educated and a licensed certified public accountant. She testified she had read the counterclaim. She would not have had trouble in understanding what was stated therein. Under this evidence, the circuit court could properly determine virtually all of respondent's allegations as to improper sexual conduct by petitioner were known by respondent to be false.

■ Respondent is correct in her contention that the court cannot directly punish her under section 2—611 for attempting to harass petitioner by her conduct in embarrassing him in the media and through posters. Nevertheless, she can be sanctioned for filing false pleadings with the intent to harass. (*Szabo Food Service, Inc. v. Canteen Corp.* (7th Cir. 1987), 823 F.2d 1073; *Thornton v. Wahl* (7th Cir. 1986), 787 F.2d 1151.) Evidence of her general intent to harass bears upon the question of whether she acquiesced in false pleadings with intent to harass.

■■ Respondent's contention the court erred in refusing to consider new evidence at the hearing on sanctions arose because she offered, but was not permitted to introduce, testimony from a witness who would testify she had made statements to him in 1984 about her sex life with petitioner which were consistent with her testimony at trial, thus tending to prove the truth of some of the allegations of her counterclaim. While the proceedings at a section 2—611 hearing are necessarily summary, the court should hear all evidence that is reasonably material, relevant, and significant to the issue before the court unless the evidence is barred by some rule. Here, however, evidence of respondent's hearsay statement would have been admissible as a prior consistent statement if an express or implied charge has been made by petitioner that her testimony at trial was a *recent* fabrication, and she had made her statement before she had incentive to fab-

ricate. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14, at 398 (4th ed. 1984).) The evidence at trial clearly showed petitioner and respondent were in sharp dispute in 1984, and respondent had substantial incentive to fabricate to shame petitioner even at that time. No error resulted from the court's refusal of the evidence.

■■ Runge contends the affidavits filed by petitioner which accompanied his request for sanctions were inadequate. They concerned fees and costs incurred by petitioner in responding to the counterclaim and request to hold him in contempt. They contained an itemized schedule of time spent by two attorneys, listing the time and nature of services performed on a daily basis. Runge also maintains he was not shown to be a part of any plot to defame petitioner, and he should not be required to pay for work done to clear petitioner's name. However, similar affidavits were deemed satisfactory in a section 2—611 proceeding in *Fried* (187 Ill. App. 3d 1024, 543 N.E.2d 1018). That court recognized an attorney would not ordinarily keep time records distinguishing the time spent responding to untrue allegations from that spent in regard to true allegations. Here, the attorneys' records were specific enough to distinguish time spent after the filing of the pleadings in issue from the time spent before. We conclude the affidavits were sufficient.

Finally, respondent contends that, in sanctioning her, the trial court essentially was penalizing her for allegedly libelous activity. She claims this was improper, as those damages should be reserved for libel actions.

■■ According to historical and practice notes, in 1986 section 6—211 "was completely rewritten and greatly expanded, in an effort to make section 2—611 *a more stringent sanction* for ill-founded litigation and ill-founded claims in otherwise meritorious cases. *** It *** provide[s] that papers that are not well founded in fact or law or are interposed for an improper purpose may be the basis for sanctions that include, *but are not limited to,* fees and costs." (Emphasis added.) (Ill. Ann. Stat., ch. 110, par. 2—611, Supplement to Historical and Practice notes, at 21-22 (Smith-Hurd Supp. 1989).) Clearly, punishing offending parties and attorneys is a proper purpose of a section 2—611 sanction.

Here, approximately half of the $30,000 award was for attorneys fees and expenses. The other half was clearly punishment. The thrust of the wrong for which the punishment was imposed was not because it defamed petitioner. Rather, the heart of the misconduct by respondent was that the allegations were untrue and harassed petitioner.

Similarly, Runge's filing of the allegations was careless and thereby served to harass. The fact the allegations were defamatory was a proper compounding factor.

No error resulted from imposition of the sanctions.

We affirm for the reasons stated.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.